Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Email: rmoest@gmail.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RICHARD STREKAL, derivatively on behalf of VISTAGEN THERAPEUTICS, INC.,<br>Plaintiff,<br><br>v.<br><br>SHAWN K. SINGH, JOSHUA PRINCE, ANN M. CUNNINGHAM, JOANNE CURLEY, MARGARET M. FITZPATRICK, JON S. SAXE, JERRY B. GIN, and MARY L. ROTUNNO,<br><br>Defendants,<br><br>and<br><br>VISTAGEN THERAPEUTICS, INC.,<br><br>Nominal Defendant. | Case No.:<br><br>**DEMAND FOR JURY TRIAL**<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

## INTRODUCTION

Plaintiff Richard Strekal ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Vistagen Therapeutics, Inc. ("Vistagen"

or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Shawn K. Singh ("Singh"), Joshua Prince ("Prince"), Ann M. Cunningham ("Cunningham"), Joanne Curley ("Curley"), Margaret M. FitzPatrick ("FitzPatrick"), Jon S. Saxe ("Saxe"), Jerry B. Gin ("Gin"), and Mary L. Rotunno ("Rotunno") (collectively, the "Individual Defendants," and together with Vistagen, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Vistagen, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Singh and Prince for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Vistagen, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from April 1, 2024 through December 16, 2025, both dates inclusive (the "Relevant Period").

2. Vistagen is a late-stage clinical biopharmaceutical company which develops therapy treatments for neuropsychiatric and neurological disorders. The Company accomplishes this through the use of pherines, which selectively bind to peripheral receptors in human nasal chemosensory neurons and are intended to rapidly activate nose-

to-brain neurocircuits which are thought to regulate brain areas without requiring systemic absorption or uptake into the brain to achieve desired benefits.

3. The Company's leading product candidate is Fasedienol, which is intended to be used for the treatment of anxiety in adults who suffer from social anxiety disorder.

4. At the start of the Relevant Period, the Company announced the initiation of the Phase 3 PALIDSADE-3 study for Fasedienol (the "PALISADE-3 Study"). The PALIDSADE-3 Study was a double-blind, placebo-controlled study intended to test the efficacy, safety, and tolerability of Fasedienol.

5. Throughout the Relevant Period, the Individual Defendants continued to highlight enhancements made to the PALISADE-3 Study. For example, on June 11, 2024, the Company hosted an earnings call to discuss its financial results for the fourth quarter and full year of the 2024 Fiscal Year.[1] During the earnings call, Defendant Singh stated the following, in relevant part:

> ***While the public speaking challenge design of PALISADE-2 and the use of the subjective units of distressed scale, or SUDS, is the primary efficacy end point in the studies and are unchanged, we've built some notable enhancements into PALISADE-3 and PALISADE-4 and made some operational changes we believe will help optimize quality enrollment . . .***[2]

6. The truth emerged December 17, 2025, after the market closed, when the Company issued a press release announcing the results of the PALISADE-3 Study (the "PALISADE-3 Results Press Release"). The PALISADE-3 Results Press Release revealed that the PALISADE-3 Study failed to demonstrate statistical significance for the treatment of social anxiety disorder based on the primary endpoint of change on the Subjective Units

---

[1] The Company's fiscal year does not follow the calendar year but instead starts on April 1 and ends on March 31 of the following year.
For the fiscal year from April 1, 2023 through March 31, 2024, the "2024 Fiscal Year."
For the fiscal year from April 1, 2024 through March 31, 2025, the "2025 Fiscal Year."
For the fiscal year from April 1, 2025 through March 31, 2026, the "2026 Fiscal Year."

[2] Unless stated otherwise, all emphasis herein is added.

of Distress Scale ("SUDS").

7. On this news, the price of the Company's stock fell $3.50 per share, or approximately 80.3%, from a close of $4.36 per share on December 16, 2025, to close at $0.86 per share on December 17, 2025.

8. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Vistagen, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the positive results of the PALISADE-2 study and the enhancements made to the PALISADE-3 Study did not mean that the results of PALISADE-3 would be positive; (2) there is a risk of heightened placebo responses, site variability, and measurement noise in trials with public-speaking based endpoints, as witnessed from the Company's Phase 2 trials; (3) as a result of the foregoing, the risk of failure in the PALISADE-3 Study was understated; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

9. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

10. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

11. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12. In light of the Individual Defendants' misconduct—which has subjected the Company, its President and Chief Executive Officer ("CEO"), and its Chief Operating Officer ("COO") to a federal securities fraud class action pending in the United States District Court for the Northern District of California (the "Securities Class Action"), which

has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

13. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendants Singh and Prince's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17. This derivative action is not a collusive action to confer jurisdiction on a court

of the United States that it would not otherwise have.

18. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

19. Plaintiff is a current shareholder of Vistagen. Plaintiff has continuously held Vistagen common stock at all relevant times.

### Nominal Defendant Vistagen

20. Vistagen is a Nevada corporation with principal executive offices at 343 Allerton Ave., South San Francisco, California 94080. Vistagen's common stock trades on the Nasdaq Capital Market ("Nasdaq") under the ticker symbol "VTGN."

### Defendant Singh

21. Defendant Singh has served as the Company's CEO and as a Company director since August 2009. Defendant Singh has also served as the Company's President since December 2024.

22. The Schedule 14A the Company filed with the SEC on July 28, 2025 (the "2025 Proxy Statement") stated the following about Defendant Singh, in relevant part:

> Mr. Singh has served as our Chief Executive Officer and as a member of our Board since August 2009, and as President since December 2024. Mr. Singh has over 30 years of experience working with biotechnology, medical device and pharmaceutical companies, both private and public. From 2001 to August 2009, Mr. Singh served as Managing Principal of Cato BioVentures, a life science venture capital firm, and as Chief Business Officer and General Counsel of Cato Research Ltd (now Allucent), a contract research organization (*CRO*) previously affiliated with Cato BioVentures. Mr. Singh served as President (part-time) of Echo Therapeutics, a medical device company, from 2007 to 2009, and as a member of its board of directors from 2007 to 2011. He also served as Chief Executive Officer (part-time) of

> Hemodynamic Therapeutics, a private biopharmaceutical company previously affiliated with Cato BioVentures, from 2004 to 2009. From 2000 to 2001, Mr. Singh served as Managing Director of Start-Up Law, a management consulting firm serving biotechnology companies. Mr. Singh also served as Chief Business Officer of SciClone Pharmaceuticals (formerly Nasdaq: SCLN), a specialty pharmaceutical company, from 1993 to 2000, and as a corporate finance associate of Morrison & Foerster LLP, an international law firm, from 1991 to 1993. Mr. Singh earned a B.A., with honors, from the University of California, Berkeley, and a J.D. from the University of Maryland School of Law. Mr. Singh is a member of the State Bar of California.
>
> We selected Mr. Singh to serve on our Board due to his substantial practical experience and expertise in multiple senior leadership roles with private and public biotechnology, pharmaceutical and medical device companies, and his extensive experience in corporate finance and capital markets, venture capital, corporate governance, drug development, intellectual property, regulatory affairs and strategic collaborations.

**<u>Defendant Prince</u>**

23. Defendant Prince has served as the Company's COO since October 2023. Previously, Defendant Prince served as the Company's Senior Vice President, Business Operations from November 2021 until October 2023.

24. The 2025 Proxy Statement stated the following about Defendant Prince:

> ***Joshua S. Prince, MBA***, has served as our Chief Operating Officer since October 2023 and served as our Senior Vice President, Business Operations, from November 2021 until October 2023. Mr. Prince has over 20 years of experience in the pharmaceutical industry. Throughout his career, he has developed extensive expertise from early development through commercial launch of pharmaceuticals across a range of therapeutic areas. Prior to joining the Company, Mr. Prince held multiple positions at CSL Behring (ASX: CSL), Teva Pharmaceuticals (NYSE: TEVA), and AstraZeneca PLC (Nasdaq: AZN), including North American Lead, Commercial Insight and Analytics, Senior Director of CNS Global Insight, and Director of Forecasting & Performance Analytics. Mr. Prince holds a B.S. in Mechanical Engineering from the University of Missouri-Rolla, and an MBA from The Pennsylvania State University.

(Emphasis in original).

**Defendant Cunningham**

25. Defendant Cunningham has served as a Company director since January 2019. Defendant Cunningham also serves as the Chair of the Compensation Committee and the Chair of the Corporate Governance and Nominating Committee, as well as a member of the Audit Committee. Previously, Defendant Cunningham served as the Company's Chief Commercial Officer from May 2021 until November 2022.

26. The 2025 Proxy Statement stated the following about Defendant Cunningham:

> Ms. Cunningham has served as a member of our Board since January 2019 and served as the Company's Chief Commercial Officer from May 2021 to November 2022. Currently, Ms. Cunningham is the Founder and Managing Partner of i3 Strategy Partners, a consulting firm founded in 2018 specializing in assisting companies in the pharmaceutical space. Prior to founding i3 Strategy Partners, Ms. Cunningham served as Vice President, Neurodegenerative Diseases and Psychiatry for Teva Pharmaceuticals Industries, Ltd. (NYSE: TEVA) from 2015 to 2018, as Senior Marketing Director for Otsuka Pharmaceutical Companies from 2013 to 2015 and in several marketing-focused positions for Eli Lily and Company (NYSE: LLY) from 1999 to 2013, including serving as Global Marketing Senior Director from 2009 to 2013. Ms. Cunningham holds a B.A. in Psychology from Yale University and a MBA, with a focus on marketing management, from the University of Michigan.
>
> We selected Ms. Cunningham to serve on our Board due to her substantial experience in healthcare commercialization and marketing, particularly in the successful development, positioning and commercial launch of products to treat neuropsychiatric disorders. Ms. Cunningham brings an insightful commercial perspective to us and to our Board that is critical as our pipeline products move from clinical development to commercialization.

**Defendant Curley**

27. Defendant Curley has served as a Company director since April 2021. She

also serves as a member of the Audit Committee and the Corporate Governance and Nominating Committee.

28. The 2026 Proxy Statement stated the following about Defendant Curley:

> Dr. Curley has served as a member of our Board of Directors since April 2021. Dr. Curley brings more than 25 years of experience in the development and commercialization of pharmaceutical products, including research and development governance. From March 2020 until her retirement in October 2023, Dr. Curley served as the Chief Development Officer at Vera Therapeutics, Inc. (Nasdaq: VERA). Prior to joining Vera Therapeutics, from June 2005 to March 2020, Dr. Curley held various director-level positions with Gilead Sciences, Inc. (Nasdaq: GILD), during which time the anti-viral portfolio grew from four to seventeen commercial products. While at Gilead, Dr. Curley led Project and Portfolio Management with oversight of the development pipeline across four therapeutic areas and was responsible for research and development governance. Before Gilead, Dr. Curley worked as an aerosol formulation scientist and subsequently as a project leader at Nektar Therapeutics (Nasdaq: NKTR). Dr. Curley received a B.Sc in Physics and Chemistry from Trinity College, Ireland, a Ph.D. in Polymer Science and Engineering from the University of Massachusetts, Amherst and completed a post-doctorate at Massachusetts Institute of Technology and Harvard Medical School, focused on long-acting biodegradable formulations.
>
> We selected Dr. Curley to serve on our Board due to her extensive experience in early product development, regulatory approval and commercialization of pharmaceutical products, giving her a unique perspective of the life cycle of drug development.

**<u>Defendant FitzPatrick</u>**

29. Defendant FitzPatrick has served as a Company director since July 2021, and as the Board's Chair since 2023. Defendant FitzPatrick also serves as a member of the Compensation Committee.

30. The 2025 Proxy Statement stated the following about Defendant FitzPatrick:

> Ms. FitzPatrick has served on our Board of Directors since July 2021, and as Chair since October 2023. Ms. FitzPatrick is the Founder of FitzPatrick & Co., LLC, a business advisory firm founded in July 2020. Prior to the founding

of FitzPatrick & Co. LLC, Ms. FitzPatrick served as Senior Vice President, Corporate Affairs, Philanthropy and Customer Engagement at Exelon Corporation (Nasdaq: EXC), a diversified clean energy company, from 2016 to 2020, as Global Chief Communications Officer at Johnson & Johnson (NYSE: JNJ), one of the largest and most broadly-based healthcare companies, from 2013 to 2016, as Global Chief Communication Officer and President of the Foundation at CIGNA from 2010 to 2013. Ms. FitzPatrick also served as Executive Vice President at APCO Worldwide, a global public affairs and strategic communications consultancy, where she counseled executives on major global reputation efforts for notable industry leaders. Ms. FitzPatrick currently serves on the board of directors of AN2 Therapeutics, Inc. (Nasdaq: ANTX), where she is lead independent director and a member of the Nominating and Corporate Governance Committee. Ms. FitzPatrick holds a B.A. in English and Policy Studies from Syracuse University, and an M.A. in Public Policy from The George Washington University. In 2018, she completed the Harvard Business School program for corporate directors. She is a National Association of Corporate Directors (*NACD*) Certified Director and a faculty member of NACD's Board Advisory Services.

We selected Ms. FitzPatrick to serve as Chair of our Board due to her extensive experience in corporate governance and leadership at some of the world's most successful companies. The Board believes Ms. FitzPatrick's expertise in healthcare and her work in the global pharmaceutical market provides valuable contributions as the Company continues to advance the development of its product candidates to address unmet patient needs.

**Defendant Saxe**

31. Defendant Saxe has served as a Company director since 2000, serving as Chair of the Board until 2023. Defendant Saxe also serves as the Chair of the Audit Committee, and as a member of the Compensation Committee and the Corporate Governance and Nominating Committee.

32. The 2025 Proxy Statement stated the following about Defendant Saxe:

Mr. Saxe has served as a director on our Board since 2000, and served as Chair of our Board until October 2023. He currently serves as the Chair of our Audit Committee. Mr. Saxe is the retired President and was a director of PDL BioPharma from 1989 to 2008. From 1989 to 1993, he was President, Chief Executive Officer and a director of Synergen, Inc. (acquired by Amgen).

> Mr. Saxe served as Vice President, Licensing & Corporate Development for Hoffmann-Roche from 1984 through 1989, and Head of Patent Law for Hoffmann-Roche from 1978 through 1989. Mr. Saxe currently is the lead director of K2x Technology and Life Sciences, is Chair of the board of directors of Epalex Corporation, and serves as a director of five additional private life science companies, Aether, Inc., Achelios Therapeutics, Inc., Arbor Vita Corporation, NuvOx Pharma, LLC and Trellis Bioscience, Inc. In addition, Mr. Saxe serves as a board observer of InGeneron, Inc. and Renexxion, Inc. Mr. Saxe has also served as a director of other biotechnology and pharmaceutical companies, including ID Biomedical (acquired by GlaxoSmithKline), Sciele Pharmaceuticals, Inc. (acquired by Shionogi), Amalyte (acquired by Kemin Industries), Cell Pathways (acquired by OSI Pharmaceuticals), Lumos Pharma, Inc. (merged with New Link Genetics) and other companies, both public and private. Mr. Saxe has a B.S.Ch.E. from Carnegie-Mellon University, a J.D. degree from George Washington University and an LL.M. degree from New York University. In addition, Mr. Saxe has a Certificate in Management from Fuqua School of Business, Duke University.
>
> We selected Mr. Saxe to serve as a director on our Board of Directors due to his numerous years of experience as a senior executive with major pharmaceutical and biotechnology companies, including Protein Design Labs, Inc., Synergen, Inc. and Hoffmann-Roche, Inc., as well as his extensive experience serving as a director of numerous private and public biotechnology and pharmaceutical companies, serving as Chairman, and Chair and member of audit, compensation and governance committees of both private and public companies. Mr. Saxe provides us and our Board of Directors with highly valuable insight and perspective into the biotechnology and pharmaceutical industries, as well as the strategic opportunities and challenges that we face.

**<u>Defendant Gin</u>**

33. Defendant Gin served as a Company director from March 2016 until September 2025. In that time, Defendant Gin served as the Chair of the Compensation Committee and as a member of the Audit Committee.

34. The Schedule 14A the Company filed with the SEC on July 17, 2024 (the "July 2024 Proxy Statement") stated the following about Defendant Gin:

> Dr. Gin has served on our Board of Directors since March 2016. Dr. Gin is currently the co-founder and CEO of Nuvora, Inc., a private company founded in 2006 with a drug delivery platform for the sustained release of ingredients through the mouth for such indications as dry mouth, biofilm reduction and sore throat/cough relief. Dr. Gin is also co-founder and Chairman of Livionex, a private platform technology company founded in 2009 and focused on oral care, ophthalmology and wound care. Previously, Dr. Gin co-founded Oculex Pharmaceuticals in 1993, which developed technology for controlled release delivery of drugs to the interior of the eye, specifically to treat macular edema, and served as President and CEO until it was acquired by Allergan in 2003. Prior to forming Oculex, Dr. Gin co-founded and took public ChemTrak, which developed a home cholesterol test commonly available in drug stores today. Prior to ChemTrak, Dr. Gin was Director of New Business Development and Strategic Planning for Syva, the diagnostic arm of Syntex Pharmaceuticals, Director for Pharmaceutical and Diagnostic businesses for Dow Chemical, and Director of BioScience Labs (now Quest Laboratories), the clinical laboratories of Dow Chemical. Dr. Gin received his B.S. in Chemistry from the University of Arizona, his Ph.D. in Biochemistry from the University of California, Berkeley, his MBA from Loyola College, and conducted his post-doctoral research at the National Institutes of Health.
>
> We selected Dr. Gin to serve on our Board due to his extensive experience in the healthcare industry, focusing his substantial business and scientific expertise on founding and developing numerous biopharmaceutical, diagnostic and biotechnology companies and propelling them to their next platforms of growth and value.

**Defendant Rotunno**

35. Defendant Rotunno served as a Company director from July 2021 until April 2026. In that time, Defendant Rotunno also served as the Chair of the Corporate Governance and Nominating Committee and as a member of the Audit Committee.

36. The 2025 Proxy Statement stated the following about Defendant Rotunno:

> Ms. Rotunno has served as a member of our Board since July 2021. Prior to her retirement in March 2024, Ms. Rotunno served as General Counsel of El Camino Health, a health care system, since January 2014, and as a Member of the Executive Leadership Team at El Camino Health since August 2015. Ms. Rotunno is also Chair of the Compensation Committee for healthcare

> provider Momentum for Health, located in San Jose, California. Before joining El Camino Health, Ms. Rotunno spent over 11 years as Senior Counsel and Client Service Leader for Common Spirit Health, formerly Dignity Health, in California's San Francisco Bay Area. Prior to Dignity Health, she held various legal roles at Varian Medical Systems, Manatt, Phelps & Phillips, Golden Living, and Pillsbury Winthrop Shaw Pitman. Ms. Rotunno graduated with honors from the University of Illinois with a B.S. in Nursing. She worked as a registered nurse before earning her J.D. degree, cum laude, from the University of California, Hastings College of Law, San Francisco. She obtained certification by the NACD, Stanford Directors College, the Women's Corporate Board Readiness Program at Santa Clara University and completed the Hastings Leadership Academy for Women and Dignity Health Ministry Leadership Program.
>
> We selected Ms. Rotunno to serve on our Board due to her extensive experience as an advocate for both patients and healthcare providers and her insights into strategies for value-based care and an understanding of the life cycle of the mental healthcare experience. Ms. Rotunno also brings insights on complex governance, regulatory and compliance requirements to complement her strategic vision and skills for scenario planning and enterprise risk management.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

37. By reason of their positions as officers, directors, and/or fiduciaries of Vistagen and because of their ability to control the business and corporate affairs of Vistagen, the Individual Defendants owed Vistagen and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Vistagen in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Vistagen and its shareholders so as to benefit all shareholders equally.

38. Each director and officer of the Company owes to Vistagen and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

39. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Vistagen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40. To discharge their duties, the officers and directors of Vistagen were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

41. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Vistagen, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

42. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to

disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

43. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Vistagen were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, California, and the United States, and pursuant to Vistagen's Code of Business Conduct (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Vistagen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Vistagen and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Vistagen's operations would comply with all applicable laws and Vistagen's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements

made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

44. Each of the Individual Defendants further owed to Vistagen and its shareholders the duty of loyalty requiring that each favor Vistagen's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

45. At all times relevant hereto, the Individual Defendants were the agents of each other and of Vistagen and were at all times acting within the course and scope of such agency.

46. Because of their advisory, executive, managerial, directorial, and controlling positions with Vistagen, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

47. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Vistagen.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

48. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The

Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

49. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

50. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Vistagen was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

51. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

52. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Vistagen and were at all times acting within the course and scope of such agency.

## VISTAGEN'S CODE OF CONDUCT

53. Vistagen's Code of Conduct states that "Vistagen is committed to driving innovation in developing pharmaceutical products to improve the standard of care for patients suffering from numerous central nervous system (CNS) disorders." The Code of Conduct also notes that it applies to "all employees, supervisors, officers, the Board of Directors, Clinical and Regulatory Advisory Board and third parties acting on Vistagen's behalf (collectively Personnel)."

54. In the section titled "Conducting Business with Integrity," the Code of Conduct states the following:

> Ethical behavior goes beyond simply complying with laws and regulations, which provide fundamental guardrails for the biopharma industry. Vistagen is committed to doing the right thing, regardless of the situation or circumstances. This instills a culture of integrity that resonates both within Vistagen as well as with the vendors, contractors, development partners, health care providers, payors, regulatory bodies, and ultimately, patients with whom we may interact. The responsibility of conducting business with integrity is not tied to a particular job title or role in the Company. Rather, all Personnel should always strive to conduct themselves with integrity.

55. In the same section, under the subsection titled "Compliance with Laws and Regulations," the Code of Conduct states the following:

> When performing duties on behalf of Vistagen, all Personnel are required to comply with all laws, rules, and regulations applicable to the Company wherever it does business. You are expected to use good judgment and common sense in seeking to comply with all applicable laws, rules and regulations, and to ask for advice when you are uncertain about them. Moreover, if you become aware of a violation of any law, rule, or regulation by the Company or any of its Personnel, it is your responsibility to promptly report the matter to your supervisor, the Chief Executive Officer, the General Counsel, or to the ethics hotline described below. Nothing in this Code should discourage you from reporting any suspected illegal activity, including any violation of the securities laws, antitrust laws, environmental laws or any other federal, state or foreign law, rule or regulation, to the appropriate authorities. **Employees, officers and directors shall not discharge, demote, suspend,**

> **threaten, harass, or in any other manner discriminate against an employee because he or she, in good faith, reports any such suspected violation**. This Code should not be construed to prohibit you from testifying, participating, or otherwise assisting in any state or federal administrative, judicial or legislative proceeding or investigation.

(Emphasis in original).

56. In the same section, in the subsection titled "Avoiding Conflicts of Interest and Conflicts of Commitment," the Code of Conduct states the following, in relevant part:

> When performing duties on behalf of Vistagen, all Personnel are expected to act in the best interests of the Company and to refrain from engaging in any activity or having a personal interest in any transaction or activity that presents a "conflict of interest1." Additionally, as described in your employment letter, employees are expected to devote substantially all of their professional time to the business of the Company so that conflicts of commitment do not arise.
>
> A conflict of interest occurs when personal, financial, or outside interests present the prospect of personal gain or benefit or make it difficult to perform one's job responsibilities objectively and/or in Vistagen's best interests. A conflict of interest also occurs when the personal, financial, or outside interests of our Personnel's family or close friends are or may be contrary to Vistagen's best interests. Even the appearance of a conflict of interest can damage the reputations of our Personnel and the Company. Unresolved conflicts of interest also jeopardize the critical element of trust between the Company and our stockholders and potential investors, federal and state securities regulators, the FDA, and other regulators who will approve our products, as well as the healthcare professionals and patients who will use our approved products.

57. In the same section, in the subsection titled "Maintaining the Integrity of Information and Records," the Code of Conduct states the following:

> As a public company, Vistagen routinely discloses information about its financial condition and operations, including the results of our research and clinical studies. This includes filing fair, timely, and understandable disclosures, reports, and documents with the U.S. Securities and Exchange Commission, as well as with public earnings releases and various press releases. The integrity of our "business records" and public disclosures

> depends on the validity, accuracy, and completeness of the information supporting the entries in our books and the records of our business and R&D activities. It is incumbent on our Personnel to ensure that our corporate records are completed accurately and honestly.
>
> Our Personnel who are responsible for regulatory filings and public disclosures, including our chief executive and financial, legal and accounting officers, must ensure that such records and reports comply with applicable laws and standards, including the Generally Accepted Accounting Principles (GAAP), and do not contain any materially false, or intentionally misleading entries. Making false or misleading entries, whether related to financial results, research and development activities, or otherwise, is strictly prohibited.

58. In the section Excellence in Our Activities, in the subsection titled "Research and Development Conduct," the Code of Conduct states the following:

> We are committed to scientific excellence in pharmaceutical research and development. Our goal is to address serious unmet medical needs related to CNS disorders.
>
> All Vistagen-sponsored studies are designed and conducted in accordance with applicable laws, regulations, and guidelines, as well as recognized ethical standards, such as Good Laboratory Practice (GLP), Good Manufacturing Practice (GMP), and Good Clinical Practice (GCP), and under the oversight of an Independent Review Board (IRB) or Ethics Committee (EC). All clinical investigators are trained on the study protocol and applicable scientific and ethical standards. For preclinical trials, we conduct animal research responsibly and in a humane and ethical manner.
>
> We recognize the importance of making clinical studies and related results available and accessible and doing so in a manner that supports our business objectives. To that end, Vistagen follows applicable regulations relating to registering our trials and reporting their results on sites such as clinicaltrials.gov. Scientific articles that report the results of Company-sponsored clinical research studies will be accurate, and objective, and disclose any funding and editorial support provided by the Company.

59. In the section titled "Waivers and Amendments of This Code," the Code of Conduct states the following:

> This Code is distributed to and acknowledged by all Personnel in writing when they join the Company, and their obligation of continuing compliance is certified thereafter annually. If you believe that a waiver under a provision of this Code is warranted, please contact the Legal Department, which must obtain the approval of the CEO to grant a waiver of this Code in certain limited circumstances. In addition, a majority of the independent directors or the Audit Committee of the Board of Directors must approve a waiver for any director or executive officer.
>
> Vistagen reserves the right to amend any provision of this Code at any time, including adding links or cross references to other policies and procedures as they may be adopted from time to time.
>
> This Code is effective when approved and, as of its approval date, will supersede previous codes of conduct. It is intended that this Code will both complement and underpin Vistagen's other policies as well as the employee handbook of our professional employer organization.

60. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Vistagen's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## VISTAGEN'S AUDIT COMMITTEE CHARTER

61. The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states that the purpose of the Audit Committee is to:

> The Audit Committee (the "Committee") is appointed by the Board of Directors (the "Board") of Vistagen Therapeutics, Inc., a Nevada corporation (the "Company") to oversee the Company's accounting and financial

reporting processes and the audits of the Company's financial statements.

62. In a section titled "Authorities and Responsibilities," under the subheading "General," the Audit Committee Charter states:

> The Audit Committee shall discharge its responsibilities, and shall assess the information provided by the Company's management and the independent auditor, in accordance with its business judgment. Management is responsible for the preparation, presentation, and integrity of the Company's financial statements and for the appropriateness of the accounting principles and reporting policies that are used by the Company. The independent auditors are responsible for auditing the Company's financial statements and for reviewing the Company's unaudited interim financial statements. The authority and responsibilities set forth in this Charter do not reflect or create any duty or obligation of the Audit Committee to plan or conduct any audit, to determine or certify that the Company's financial statements are complete, accurate, fairly presented, or in accordance with generally accepted accounting principles or applicable law, or to guarantee the independent auditor's report.

63. In the same section, under the subheading "Controls and Procedures," the Audit Committee Charter states that the Audit Committee will:

> 10. Oversight. The Audit Committee shall coordinate the Board of Directors' oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct. The Audit Committee shall receive and review the reports of the CEO and CFO required by Rule 13a-14 of the Exchange Act.
>
> 11. Procedures for Complaints. The Audit Committee shall establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.
>
> 12. Related-Party Transactions. The Audit Committee shall review all related party transactions on an ongoing basis, and all such transactions must be approved by the Audit Committee.
>
> 13. Additional Powers. The Audit Committee shall have such other duties as may be delegated from time to time by the Board of Directors.

64. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

65. Vistagen is a late-stage clinical biopharmaceutical company which develops therapy treatments for neuropsychiatric and neurological disorders. The Company accomplishes this through the use of pherines, which selectively bind to peripheral receptors in human nasal chemosensory neurons and are intended to rapidly activate nose-to-brain neurocircuits which are thought to regulate brain areas without requiring systemic absorption or uptake into the brain to achieve desired benefits.

66. The Company's leading product candidate is Fasedienol, which is intended to be used for the treatment of anxiety in adults who suffer from social anxiety disorder.

67. At the start of the Relevant Period, the Company announced the initiation of the Phase 3 PALIDSADE-3 Study for Fasedienol. The PALIDSADE-3 Study was a double-blind, placebo-controlled study intended to test the efficacy, safety, and tolerability of Fasedienol.

### False and Misleading Statements

***April 1, 2024 Press Release***

68. The Relevant Period began on April 1, 2024, when the Company issued a

press release announcing that enrollment had begun in the PALISADE-3 Study (the "PALISADE-3 Enrollment Press Release"), announcing the first patient had been enrolled in the PALISADE-3 Study.

69. The PALISADE-3 Enrollment Press Release stated the following:

> PALISADE-3, similar to PALISADE-2, is a randomized, double-blind, placebo-controlled Phase 3 study designed to evaluate the efficacy, safety, and tolerability of the acute administration of fasedienol to relieve anxiety symptoms in patients with SAD induced by a public speaking challenge conducted in a clinical setting. The primary outcome measure is the patient self-rated Subjective Units of Distress Scale (SUDS). The U.S. multi-center study is planned to randomize approximately 236 adults ages 18 through 65. Patients will be randomized in a 1:1 ratio to fasedienol or placebo. Patients who complete PALISADE-3 will have an option to enroll in an open-label extension. Vistagen plans to initiate PALISADE4, which will be a replicate of PALISADE-3, during the second half of 2024.

***April 16, 2024 Proxy Statement***

70. On April 16, 2024, the Company filed a proxy statement on Schedule 14A with the SEC (the "April 2024 Proxy Statement"). Defendants Singh, Cunningham, Curley, FitzPatrick, Gin, Rotunno, and Saxe solicited the April 2024 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

71. The April 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*, (1) approve an amendment to the Company's Amended and Restated 2019 Ominbus Equity Incentive Plan (the "2024 Amendment to the 2019 Plan"); and (2) approve an amendment to the Company's 2019 Employee Stock Purchase Plan.

72. As disclosed in the April 2024 Proxy Statement, if Vistagen shareholders approved the 2024 Amendment to the 2019 Plan, an additional 4 million shares would be made available for issuance, bringing the total number of shares available under the 2019 Plan to 5 million. As of April 9, 2024, only 30,438 shares remained available for issuance, meaning that upon approving the 2024 Amendment to the 2019 Plan, there would be 4,030,438 shares available for issuance. The April 2024 Proxy Statement states that

"employees, non-employee directors and consultants" are eligible to receive awards in the form of "stock options, stock appreciation rights (*SARs*), restricted stock, restricted stock units, and other stock-based awards, and performance awards" under the 2019 Plan. The April 2024 Proxy Statement stated the purpose of the April 2024 Amendment to the 2019 Plan as "[f] ollowing the announcement of the positive results from our PALISADE-2 Phase 3 study of fasedienol for acute treatment of social anxiety disorder in the second half of 2023, our Company has grown, and we expect to continue to grow as we advance the development of fasedienol and our platform of additional clinical-stage neuroscience product candidates."

73. Defendants Singh, Cunningham, Curley, FitzPatrick, Gin, Rotunno, and Saxe caused the April 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the positive results of the PALISADE-2 study and the enhancements made to the PALISADE-3 Study did not mean that the results of PALISADE-3 would be positive; (2) there is a risk of heightened placebo responses, site variability, and measurement noise in trials with public-speaking based endpoints, as witnessed from the Company's Phase 2 trials; (3) as a result of the foregoing, the risk of failure in the PALISADE-3 Study was understated; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

74. As a result of Defendants Singh, Cunningham, Curley, FitzPatrick, Gin, Rotunno, and Saxe causing the April 2024 Proxy Statement to be false and misleading, Company shareholders voted, inter alia, to: (1) approve the 2024 Amendment to the 2019 Plan; and (2) approve an amendment to the Company's 2019 Employee Stock Purchase Plan.

75. As a result of the shareholders approving the 2024 Amendment to the 2019 Plan, there were an additional 4 million shares available for issuance under the 2019 Plan. The Individual Defendants, including many of whom are current directors of the Company,

received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading April 2024 Proxy Statement and the shareholders approving the 2024 Amendment to the 2019 Plan. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the 2019 Plan in the future.

***June 11, 2024 Financial Reports***

76. On June 11, 2024, the Company issued a press release announcing its financial results for the fourth quarter and full year of the 2024 Fiscal Year (the "FY 2024 Earnings Release"). The FY 2024 Earnings Release quoted Defendant Singh as stating, in relevant part:

> Vistagen's fiscal 2024 proved to be a year full of remarkable accomplishments. Most notably, with our PALISADE-2 trial of fasedienol, we became the first company to report positive results of a Phase 3 trial for the acute treatment of social anxiety disorder, a mental health disorder affecting the lives of over 30 million adults in the U.S for which there is no FDA-approved acute treatment option. In addition, we recently initiated our PALISADE-3 Phase 3 trial, which, if successful, has the potential to complement PALISADE-2 in support of a fasedienol U.S. New Drug Application submission. Our primary focus is on the high-quality execution of our registration-directed PALISADE Phase 3 program for fasedienol in social anxiety disorder, as well as the further progression of our non-systemic, neurocircuitry-focused pherine development programs involving itruvone for major depressive disorder and hormone-free PH80 for menopausal hot flashes. We are well-positioned on a path toward achieving multiple potential value-creating catalysts during the year ahead as we pursue our mission to develop and commercialize differentiated neuroscience therapies to improve patients' lives worldwide.

77. The FY 2024 Earnings Release went on to state the following regarding the PALISADE-3 Study, in relevant part:

- **Initiated PALISADE-3 Phase 3 Trial; Preparation for PALISADE-4 Phase 3 Trial Underway**. In the fourth quarter of fiscal 2024, Vistagen launched its PALISADE-3 Phase 3 trial of fasedienol for the acute

> treatment of SAD. With PALISADE-3 initiated, the Company is now preparing to launch its PALISADE-4 Phase 3 trial in the second half of calendar 2024. PALISADE-3 and PALISADE-4 are designed similarly to PALISADE-2, including an open-label extension for a period of up to 12 months with subjects able to use fasedienol up to 6 times per day in their everyday lives prior to anxiety-provoking social and performance stressors.
>
> * * *
>
> - In the third quarter of fiscal 2024, Vistagen closed an underwritten public offering, providing the Company with cash runway to execute critical milestones in its registration-directed PALISADE Phase 3 program for fasedienol in SAD and across other programs in its neuroscience pipeline.

(Emphasis in original).

78. That same day, the Company held an earnings call with investors and analysts to discuss the fourth quarter and year-end results (the "FY 2024 Earnings Call").

79. During the FY 2024 Earnings Call, Defendant Singh highlighted the "notable enhancements" and "operational changes" made to assist with enrollment, stating, in relevant part:

> ***While the public speaking challenge design of PALISADE-2 and the use of the subjective units of distressed scale, or SUDS, is the primary efficacy end point in the studies and are unchanged, we've built some notable enhancements into PALISADE-3 and PALISADE-4 and made some operational changes we believe will help optimize quality enrollment***, enhanced surveillance and control potential variability as well as drive rigorous protocol adherence through an execution of PALISADE-3 and PALISADE-4, all against the backdrop of what is now a far more favorable and stable clinical research environment than at any time during the pandemic.
>
> * * *
>
> ***We believe success in either PALISADE-3 or PALISADE-4, combined with the positive results from PALISADE-2 and additional open-label safety data from all fasedienol clinical trials to be completed next year, may provide substantial evidence of fasedienol's effectiveness and safety to support submission of a potential U.S. new drug application for the acute treatment***

> ***of SAD during the first half of 2026 which, if approved, could be the first approval of its kind*.**
>
> ***As a reminder, the FDA has granted Fast Track Designation for our development of fasedienol for the acute treatment of SAD*.**

80. During the question-and-answer portion of the FY 2024 Earnings Call, Defendant Singh responded to an analyst's question regarding the Company's enrollment cadence as follows:

> *Unknown Analyst*: In PALISADE-3, how many patients have you enrolled so far? And is the enrollment cadence looking stronger or slower than the first couple of studies, and then also if you don't mind commenting on the screen failure rate and how that compares to the prior studies as well?
>
> *Defendant Singh*: But what I can tell you is what I emphasized during the prepared remarks, which is ***we're very happy with the way that PALISADE-3 has kicked off. We've been able to build in some really important efficiencies not only throughout the execution of the study, but upfront even, between lead generation and actual enrollment through visit 1 and the screening***.
>
> ***We've been able to achieve a lot of the things that reflect and leverage the lessons learned through the course of the prior execution of studies of this particular design, leading all the way back to Phase II time***. So I think our team is extremely well positioned to continue this study on track and the same will be the case for PALISADE-4 with the ability to achieve the readouts right around the time that we've guided, which would be mid-'25 and then near the end of '25 for PALISADE-4.

81. In a separate conversation with an analyst regarding the supposed "operational changes" made in the enrollment process, Defendants Singh and Prince stated the following:

> *Julian Pino – Stifel, Nicolaus & Co.*: You described a couple of notable enhancements that you made, things like operational changes, enhanced surveillance, et cetera. Do you mind just providing a little bit more color on what exactly you're doing and why that gives you greater confidence as you continue enrolling PALISADE-3 and soon PALISADE-4?

*Defendant Singh*: So just to be clear right up front, the public speaking challenge design will remain the same across PALISADE-2, PALISADE-3 and PALISADE-4 as well as SUDS is the primary efficacy end point. So no changes there, those will continue, again, to remain consistent throughout the development of fasedienol for the acute treatment of SAD. And that's been the case all the way back to Phase II.

***So the refinements that we made to PALISADE-3 and PALISADE-4 really are based again on experience that we have, very unique and extensive experience, scaling up to a large Phase III study that come from our observations of the conduct of the PALISADE Phase III program from, again, the early, through the late stages of the pandemic, in particular. So the enhancements to PALISADE-3 and PALISADE-4 apply primarily to ensuring that we've got optimal subjects in the study, real extensive, precise and universally applied screening, inclusion/exclusion criteria and that the public speaking challenge protocol is administered properly and consistently with limited variability.***

*Defendant Prince*: I mean it's really around changing our approach to both study monitoring and our staffing model, right? So it gives us rigorous training of sites and then oversight of study conduct. So if you think about where we are with PALISADE-3 compared to PALISADE-1 or PALISADE-2, we had an in-person investigator meeting for PALISADE-3. So we have that face-to-face, in-person training of PIs, raters, study coordinators, which we couldn't do in PALISADE-1 and PALISADE-2.

***July 17, 2024 Proxy Statement***

82. On July 17, 2024, the Company filed the July 2024 Proxy Statement. Defendants Singh, Cunningham, Curley, FitzPatrick, Gin, Rotunno, and Saxe solicited the July 2024 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

83. The July 2024 Proxy Statement called for the Company's shareholders to vote to, inter alia: (1) re-elect Defendants Singh, Cunningham, Curley, FitzPatrick, Gin, Rotunno, and Saxe to the Board; (2) approve, on an advisory basis, the compensation of the Company's named executive officers; and (3) ratify the appointment of KPMG LLP as the Company's independent registered public accounting firm for the 2025 Fiscal Year.

84. Regarding the "Board Role in Risk Assessment," the July 2024 Proxy Statement stated:

> Management, in consultation with outside professionals, as applicable, identifies risks associated with the Company's operations, strategies and financial statements. Risk assessment is also performed through periodic reports received by the Audit Committee from management, outside legal counsel and the Company's independent registered public accountants relating to risk assessment and management. Audit Committee members meet privately in executive sessions with representatives of the Company's independent registered public accountants. The Board also provides risk oversight through its periodic reviews of the financial and operational performance of the Company.

85. Regarding the Code of Conduct, the July 2024 Proxy Statement stated:

> We have adopted a Code of Business Conduct applicable to our employees, officers and directors. Our Code of Business Conduct is available on our website at www.vistagen.com. We intend to disclose any future amendments to certain provisions of our Code of Business Conduct, or waivers of these provisions, on our website or in filings with the SEC under the Exchange Act.

86. Defendants Singh, Cunningham, Curley, FitzPatrick, Gin, Rotunno, and Saxe caused the July 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the positive results of the PALISADE-2 study and the enhancements made to the PALISADE-3 Study did not mean that the results of PALISADE-3 would be positive; (2) there is a risk of heightened placebo responses, site variability, and measurement noise in trials with public-speaking based endpoints, as witnessed from the Company's Phase 2 trials; (3) as a result of the foregoing, the risk of failure in the PALISADE-3 Study was understated; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

87. The July 2024 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not

followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the July 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

88. As a result of Defendants Singh, Cunningham, Curley, FitzPatrick, Gin, Rotunno, and Saxe causing the July 2024 Proxy Statement to be false and misleading, Company shareholders voted, inter alia, to: re-elect Defendants Singh, Cunningham, Curley, FitzPatrick, Gin, Rotunno, and Saxe to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on an advisory basis, the compensation of the Company's named executive officers; and (3) ratify the appointment of KPMG LLP as the Company's independent registered public accounting firm for the 2025 Fiscal Year.

***August 13, 2024 Financial Reports***

89. On August 13, 2024, the Company issued a press release announcing its financial results for the first quarter of the 2025 Fiscal Year (the "Q1 2025 Earnings Release").

90. The Q1 2025 Earnings Release provided the following update regarding the PALISADE-3 Study, in relevant part:

- Vistagen's **PALISADE-3 Phase 3 trial** remains on track to produce top-line results in 2025, in line with previous guidance.

- There is no FDA-approved acute treatment for SAD. Vistagen's PALISADE3 and PALISADE-4 Phase 3 trials are designed similarly to the Company's positive PALISADE-2 Phase 3 trial of fasedienol for the acute treatment of SAD reported in 2023. With PALISADE-2, Vistagen became the first company to report a positive Phase 3 trial of a new drug candidate for the acute treatment of SAD. Vistagen believes either PALISADE-3 or PALISADE-4, if successful, together with the positive results from PALISADE-2, may establish substantial evidence of the effectiveness of fasedienol in support of a potential fasedienol U.S. New

> Drug Application (NDA) submission to the FDA for the acute treatment of anxiety in adults with SAD.

(Emphasis in original).

91. That same day, the Company hosted an earnings call with investors and analysts to discuss the first quarter results (the "Q1 2025 Earnings Call").

92. During his remarks on the Q1 2025 Earnings Call, Defendant Singh highlighted the similarities between the PALISADE-3 Study with the PALISADE-2 study, which had achieved positive results. Defendant Singh stated, in relevant part:

> Last year with our PALISADE-2 Phase III trial of fasedienol, we reported the first ever positive Phase III trial of a drug candidate for the acute treatment of SAD.
>
> Earlier this year, we launched another Phase III trial, PALISADE-3, designed similarly to PALISADE-2 with the objective of replicating the success of that study. Enrollment in the PALISADE-3 study is on track, and we are also on track to initiate our PALISADE-4 Phase III study in the second half of this year, as we previously guided. That study will have the same design as PALISADE-3 and the same objective of replicating the positive results from PALISADE-2. Both of these Phase III studies as well as an exploratory Phase IIa repeat dose study will read out next year.
>
> We believe either PALISADE-3 or PALISADE-4, if successful, and together with PALISADE-2, may establish the substantial evidence of the effectiveness of fasedienol in support of a potential U.S. New Drug Application submission to the FDA, which, if approved, could establish fasedienol as the first ever FDAapproved acute treatment of SAD.
>
> * * *
>
> So again, our U.S. registration-directed PALISADE Phase III program for fasedienol for the acute treatment of SAD is our top priority, and we are on track and well funded to do what's necessary to put us in a position with the potential to achieve that important and very valuable goal for patients and for our stockholders.

93. During the question-and-answer section of the Q1 2025 Earnings Call, in

response to a question on the Company's enrollment cadence, Defendants Singh and Prince stated the following, in relevant part:

> *Lin Tsai – Jeffries LLC*: So first one for PALISADE-3. Are you by chance seeing higher screen failure rates compared to PALISADE-1 and 2? And is there anything else that you might be seeing in real time that gives you that extra boost of confidence you are doing the right thing, enrolling the right patients and executing the study even more rigorously than last time?
>
> *Defendant Prince*: ***I think at this point, what we've seen in terms of screen failure rates in terms of those that have a high enough score in the first public speaking challenge in terms of an anxiety score to move on to the second public speaking challenge, we've been pleasantly surprised that those rates have come in consistent with our projections***. So we're seeing, again, progress of the study that's in line with expectations towards the targets that we've established. And so I think in general, really things going as expected there.
>
> *Lin Tsai – Jeffries LLC*: And then can you remind us how long it took for you to start in PALISADE-1 and 2 -- I guess -- maybe PALISADE1 and whether the enrollment cadence for PALISADE-3 is looking stronger or faster than the first study?
>
> *Defendant Singh*: The question -- the enrollment cadence is on track with what we've guided. I mean look, obviously, the black swan and the pandemic impacted a lot of activity in 1 and 2, although we've been so pleasantly surprised by -- ***not really surprised but expected and happy to see, is how normative the clinical development environment is now and how we are able to have a lot more predictability on the things that caused fits and starts in prior studies during the pandemic, especially PALISADE-1. So I can tell you that we're comfortable with the cadence and we're on track***.
>
> *Defendant Prince*: I think that captures it. ***The one thing I should have mentioned before was the -- there's just a reminder that we have 2 public speaking challenges, right? So a key part of this study is the screen out in -- at visit 2 and the first public speaking challenge of those subjects who don't have a high enough anxiety level to really show improvement. It's one of the things that differentiates our study***. And it's not inclusion/exclusion, but it's a key piece of making sure that we have the right subjects moving forward to the randomization portion of the study. And those rates, those are critical for study execution. Those rates have been similar to what we observed in

PALISADE-1 and PALISADE 2.

***November 7, 2024 Financial Results***

94. On November 7, 2024, the Company issued a press release announcing its financial results for the second quarter of the 2025 Fiscal Year (the "Q2 2025 Earnings Release").

95. The Q2 2025 Earnings Release quoted Defendant Singh as stating the following:

> We are actively recruiting for both our PALISADE-3 and PALISADE-4 Phase 3 trials and remain primarily focused on execution. Our broad and diverse neuroscience pipeline is based on our novel, non-systemic, neurocircuitry-focused approaches to treating multiple challenging disorders in high-prevalence markets with inadequate current treatment options. As we head into 2025, we expect data from multiple Phase 3 clinical trials in social anxiety disorder and further advancement of our non-systemic pherine product candidates in Phase 2 programs for treatment of major depressive disorder and hormone-free treatment of menopausal hot flashes, each with potential to set a new standard of care.

96. Later that same day, the Company hosted an earnings call with investors and analysts to discuss the second quarter results (the "Q2 2025 Earnings Call").

97. During the question-and-answer portion of the Q2 2025 Earnings Call, Defendant Singh had the following correspondence with an analyst regarding enrollment in the PALISADE-3 Study, in relevant part:

> *Julian Pino – Stifel, Nicolaus & Co.*: Just wondering if you could provide a little bit of color on the pace of enrollment so far. What are you hearing from investigators about the demand in enrolling in the study? And I was wondering if these parallel studies share trial sites or anything else that you could share about the sites that you've chosen for each study?
>
> *Defendant Singh*: So there's tremendous excitement across the PIs and the site staff that we've been able now to bring together for PALISADE-3 and PALISADE-4, as you can imagine, on the other side of the PALISADE-2 success. We've got 16 sites now that are activated for PALISADE-3 and another -- and a dozen for PALISADE-4.

> ***So the color I can give you is, again, we -- this is a very important indication. It's very clear throughout the research community and a lot of these sites, of course, have psychiatrists that have been treating patients for a very long time***, and they just haven't seen anything new in a very long time, let alone something for the acute treatment of social anxiety disorder, which is so important with this disorder is enabling people to engage and not have fear of engaging in the things that stress them in their life, that create anxiety and opportunity costs in their life because they're self-isolating or withholding from engaging.
>
> * * *
>
> ***We've really enhanced surveillance with our owned assets as well as augmenting that with what we've got as resources from the CRO. So there's a lot of intense training. There's very close surveillance and adherence to the protocols, which is very important, obviously, to control variability. So I think overall, we're happy with how things are going***.

***February 13, 2025 Financial Results***

98. On February 13, 2025, the Company issued a press release announcing its financial results for the third quarter of the 2025 Fiscal Year (the "Q3 2025 Earnings Release").

99. The Q3 2025 Earnings Release quoted Defendant Singh as stating the following, in relevant part:

> We had a very productive quarter, with both PALISADE-3 and PALISADE-4 advancing towards expected top-line results later this year…. As always, we remain optimistic about the potential of our product candidates to transform standards of care and address multiple significant unmet needs. We continue to believe that 2025 has the potential to be a monumental year, between multiple anticipated data readouts for fasedienol in acute treatment of social anxiety disorder and further advancement of additional pherine product candidates for treatment of major depressive disorder and menopausal hot flashes.

100. Later that same day, the Company hosted an earnings call with investors and analysts to discuss the third quarter results (the "Q3 2025 Earnings Call").

101. During the question-and-answer portion of the Q3 2025 Earnings Call, Defendants Singh and Prince had the following exchange with an analyst regarding the execution of the PALISADE-3 Study, in relevant part:

> *Matthew Barcus – Jeffries LLC:* And then I guess, is there anything that keeps you up at night in terms of what more could be done on these studies in terms of execution?
>
> *Defendant Singh*: Interesting question. No, it doesn't keep me up at night because of the enhancements and the team that we've got executing on these studies, especially surveillance associated with rigorous adherence to the protocol. These are all very important, execution-related initiatives that we've got in place, reduced reliance on CRO surveillance, expansion of our internal team, and just the way that we've been seeing the conduct of the studies with rigorous training even upfront of any enrollment at any of the sites. It's just actually been significantly different than what we've seen in the past in a very positive way.
>
> *Defendant Prince*: It is a very interesting question. And actually, to your point, we have more visibility into what's happening with these studies than we did before running PALISADE-1 and 2 in the pandemic and with the enhancements that we've put in place. And so if anything, I would say it's easier to sleep at night now than it was back then without COVID in place, with masks down, with the review that we have of subject's eligibility, making sure that scales are administered properly, making sure that the rigorous public speaking challenge script is followed to the T, and then having the ability to do quick interaction and retraining with sites if they start to deviate from that protocol. So we feel like we're giving these studies the best chance we could at success with those changes.

***June 2, 2025 Press Release***

102. On June 2, 2025, the Company issued a press release announcing an updated timeline for the PALISADE-3 Study (the "PALISADE-3 Update Press Release").

103. The PALISADE-3 Update Press Release quoted Defendant Singh as stating the following, in relevant part:

> We are very encouraged by the progress of our PALISADE-3 trial, which remains on track for a topline readout in the fourth quarter of this year, and our PALISADE-4 trial, for which we expect topline results in the first half of

> 2026. Patient and physician enthusiasm for our PALISADE trials continues to be strong, and we remain focused on meticulous patient recruitment. With social anxiety affecting millions and rising, we are energized by fasedienol's potential to meet the clear and growing unmet need and bring meaningful relief to patients, all while delivering long-term value to shareholders.

***June 17, 2025 Financial Reports***

104. On June 17, 2025, the Company issued a press release announcing its financial results for the fourth quarter and full year of the 2025 Fiscal Year (the "FY 2025 Earnings Release").

105. Regarding the PALISADE-3 Study, the FY 2025 Earnings Release stated, in relevant part:

> - The U.S. registration-directed PALISADE Program evaluating intranasal fasedienol for the acute treatment of SAD continues to progress. The PALISADE-3 Phase 3 trial remains on track for expected topline data in the fourth quarter of this year. Topline results for the PALISADE-4 Phase 3 trial are expected in the first half of 2026.
> - Vistagen believes either PALISADE-3 or PALISADE-4, if successful, together with the positive results from PALISADE-2 reported in the second half of 2023, may establish substantial evidence of the effectiveness of fasedienol in support of a potential fasedienol New Drug Application (NDA) submission to the U.S. FDA for the acute treatment of SAD.

106. Later that same day, the Company hosted an earnings call with investors and analysts to discuss the results (the "FY 2025 Earnings Call").

107. On the question-and-answer portion of the FY 2025 Earnings Call, Defendant Singh responded to a question regarding interactions with the FDA as highlighting the enhancements the Company made to the PALISADE-3 Study, stating, in relevant part:

> *Julian Pino – Stifel, Nicolaus & Co.*: You alluded to changes with FDA leadership and there's been reports of turnover of staff and medical review teams. I guess in your interactions with the agency, have you noticed any changes or anything that's worth highlighting to sell-side and investors?

*Defendant Singh*: So back to the PALISADE-4, I think overall, we -- as I think we've talked to you and Paul about in the past and others, the enhancements that we brought to the table related to PALISADE-3, PALISADE-4 from lessons learned and improvements that could be implemented to limit variability, to enhance subject selection, to improve study execution efficiency, those kinds of things, in addition to the mask, obviously coming off and eliminating some of the COVID-related disorders, we really have been focused on very stringent subject eligibility requirements. And some of the original projections that we had were based on observations from PALISADE-2 and the recruitment rates in those studies, which steadily increase through the end of the study, especially when the world got a little bit more normal at the end of PALISADE-2.

And the impact of those positive enhancements that we made to PALISADE-3 and 4 wasn't really fully understood at the beginning but it's now very apparent and screening visits have continued to increase. And the more stringent subject eligibility requirements and secondary subject eligibility review that we integrated with developing our own internal team in addition to increasing training and remediation. So bottom line, we've been very, very picky in the way that the study can be executed, the stringent inclusion/exclusion criteria, all in an effort to, of course, replicate the success from PALISADE-2.

So I think we've got a pretty good rhythm now and we've been able to eliminate subjects who we think may be less likely to demonstrate a benefit through that more rigorous eligibility criteria that we've applied and the secondary review of subject eligibility and site conduct that's ongoing and very specific. So overall, all that together has caused a little bit of an adjustment in timing, but we think that benefits the overall potential outcome of the study.

108. In a back and forth with a separate analyst, Defendant Singh again highlighted the enhancements made to the PALISADE-3 Study, stating, in relevant part:

*Lin Tsai – Jeffries LLC*: And then earlier speaking of variability back in the successful PALISADE-2 study, I think the placebo arm showed a SUDS reduction of 8 points absolute basis. Would you expect that to be the same case for PALISADE-3 and 4? Or with these more enhanced controls could the placebo be lower?

*Defendant Singh*: Well, what we've certainly done, Andrew, is intended to

design PALISADE-3 and 4 in a manner to replicate the success we saw in PALISADE-2. Where that actually lands, we'll have to see how the cards flip but everything that we've done has been intended to limit variability. In any way, we can conceive of it after taking a look at PALISADE-1 and PALISADE-2 studies, which were the first two studies, as you know, with this design and this endpoint for the acute treatment of SAD. So a lot has been learned and the rigor matters, and so we'll see. The idea, obviously, is to increased visibility into all aspects of the study and its execution to ensure the highest impossible potential to reduce variability. So hopefully, that falls in the direction that we saw things land with PALISADE-2.

*Lin Tsai – Jeffries LLC*: And then my last question is in terms of site conduct and as well as your overall surveillance, are you making sure these PIs are disqualifying patients appropriately when these patients are taking their SUDS tests? And are you looking at these SUDS rating somehow for each patient to make sure all time points make sense with the scoring?

*Defendant Singh*: Well, the last question, again, whether it makes sense, they are what they are, in terms of the scoring. But what I can tell you in the first hand, I mean, the whole purpose of what we did majorly differently with PALISADE-3 and 4 was to develop and have internally what we call our secondary eligibility review team. This is a team, that internal Vistagen team, not a CRO team or a third-party team, but an internal team that consists of very experienced psychometricians who review eligibility of each subject, and they listen to screening assessments as well as each public speaking challenge to ensure in the proper execution.

So we think, again, that those kinds of enhancements -- and those are some of the things that take a little bit more time, especially with obviously a hyper-focus on rater training upfront, across all the endpoints, not just the SUDS, but the CGI-I and the PGIC so that you have confidence that the study is being run the way it should be run and that we've done everything that we can through all the experience we've gained through the execution of two studies already to enhance the potential for success.

***July 28, 2025 Proxy Statement***

109. On July 28, 2025, the Company filed the 2025 Proxy Statement with the SEC. Defendants Singh, Cunningham, Curley, FitzPatrick, Gin, Rotunno, and Saxe solicited the 2025 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained

material misstatements and omissions.

110. The 2025 Proxy Statement called for the Company's shareholders to vote to, inter alia: (1) re-elect Defendants Singh, Cunningham, Curley, FitzPatrick, Rotunno, and Saxe to the Board; (2) approve, on an advisory basis, the compensation of the Company's named executive officers; and (3) ratify the appointment of KPMG LLP as the Company's independent registered public accounting firm for the 2026 Fiscal Year.

111. Regarding the "Board Role in Risk Assessment," the 2025 Proxy Statement stated:

> Management, in consultation with outside professionals, as applicable, identifies risks associated with the Company's operations, strategies and financial statements. Risk assessment is also performed through periodic reports received by the Audit Committee from management, outside legal counsel and the Company's independent registered public accountants relating to risk assessment and management. Audit Committee members meet privately in executive sessions with representatives of the Company's independent registered public accountants. The Board also provides risk oversight through its periodic reviews of the financial and operational performance of the Company.

112. Regarding the Code of Conduct, the 2025 Proxy Statement stated:

> We have adopted a Code of Business Conduct applicable to our employees, officers and directors. Our Code of Business Conduct is available on our website at www.vistagen.com. We intend to disclose any future amendments to certain provisions of our Code of Business Conduct, or waivers of these provisions, on our website or in filings with the SEC under the Exchange Act.

113. Defendants Singh, Cunningham, Curley, FitzPatrick, Gin, Rotunno, and Saxe caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the positive results of the PALISADE-2 study and the enhancements made to the PALISADE-3 Study did not mean that the results of PALISADE-3 would be positive; (2) there is a risk of heightened placebo responses, site variability, and

measurement noise in trials with public-speaking based endpoints, as witnessed from the Company's Phase 2 trials; (3) as a result of the foregoing, the risk of failure in the PALISADE-3 Study was understated; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

114. The 2025 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2025 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

115. As a result of Defendants Singh, Cunningham, Curley, FitzPatrick, Gin, Rotunno, and Saxe causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, inter alia, to: re-elect Defendants Singh, Cunningham, Curley, FitzPatrick, Rotunno, and Saxe to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on an advisory basis, the compensation of the Company's named executive officers; and (3) ratify the appointment of KPMG LLP as the Company's independent registered public accounting firm for the 2026 Fiscal Year.

***August 7, 2025 Financial Reports***

116. On August 7, 2025, the Company issued a press release announcing its financial results for the first quarter of the 2026 Fiscal Year (the "Q1 2026 Earnings Release").

117. The Q1 2026 Earnings Release quoted Defendant Singh as stating, in relevant part:

> We had another productive quarter, advancing key programs across our pipeline. Our lead program, fasedienol, for acute treatment of social anxiety disorder, continues to progress, with topline results from our PALISADE-3

Phase 3 trial anticipated later this year, and topline results from our PALISADE-4 Phase 3 trial expected in the first half of 2026. With no FDA-approved acute treatment, we remain optimistic about fasedienol's potential to impact the lives of over 30 million U.S. adults affected by social anxiety disorder.

118. That same day, the Company hosted an earnings call with investors and analysts to discuss the first quarter results (the "Q1 2026 Earnings Call").

119. During the question-and-answer portion of the Q1 2026 Earnings Call, Defendants Prince and Singh stated the following in response to a question regarding the differences in the PALISADE-3 SUDS score compared to previous trials, in relevant part:

*Lin Tsai – Jeffries LLC*: And finally, do you envision PALISADE-3 baseline SUDS score to be any different from the baseline SUDS in PALISADE 1 and 2? And can you remind us what they were as well?

*Defendant Prince*: Yes, as to 2, I have to look at that. I don't have that off the top of my head, but we would expect them to be similar in terms of those numbers because we have similar inclusion criteria, the post-speaking challenge is set up identically. We would expect it to be the same.

*Defendant Singh*: So it was different. In PAL-2 was 1 minute -- at least 1 minute in order to move. Because remember, again, as I think we've talked about, enrollment is different in this study design versus randomization. So it's those that advanced to the visit 3 second speech that are included in the data set. Those are the ones who are randomized. So they have to be sufficiently stressed in the first speech in order to qualify for randomization, and that's set at the 2 minutes at least at 75, more than a little uncomfortable, at least 2 minutes of the 5 minutes during that first speech.

*Defendant Prince*: And Shawn, I would just add to that, we expect baseline to be in that similar range of roughly 80, 85, somewhere in there per SUDS at baseline.

*Defendant Singh*: Yes. Good point. But what we have seen, of course, is the more severely affected and chronically affected someone is with the disorder, and we do a lot upfront to assess that eligibility -- very strict eligibility criteria even before someone signs an ICF, there's rigorous assessment clinically. And then as they move through the eligibility criteria that we've enhanced a bit in PALISADE3 and 4 are making a difference, we think, to make sure we ensure

> that we've got a sufficiently suitable population that ultimately gets randomized. So that's been consistent across the objectives from PALISADE-2, 3 and 4.

***November 3, 2025 Press Release***

120. On November 3, 2025, the Company issued a press release announcing the completion of the PALISADE-3 Study (the "PALISADE-3 Completion Press Release").

121. The PALISADE-3 Completion Press Release quoted Defendant Singh as stating, in relevant part:

> The completion of the PALISADE-3 Phase 3 public speaking challenge study marks an important milestone for Vistagen. As we advance toward our expected topline results later this quarter, we remain encouraged by fasedienol's potential to become the first and only acute treatment for the more than 30 million people living with social anxiety disorder. We are grateful to the individuals who participated in this study, as well as the clinical investigators, site staff, and our contract research organization for their commitment and collaboration.
>
> In August 2023, Vistagen reported positive results from its randomized, doubleblind, placebo-controlled PALISADE-2 Phase 3 trial of fasedienol for the acute treatment of social anxiety disorder. The PALISADE-3 trial, and concurrent PALISADE-4 Phase 3 trial, involve the same public speaking challenge study design and primary efficacy endpoint as PALISADE-2, with certain protocol and operational enhancements related to site training, surveillance, and subject selection.

***November 13, 2025 Financial Results***

122. On November 13, 2025, the Company issued a press release announcing the financial results for the second quarter of the 2026 Fiscal Year (the "Q2 2026 Earnings Release").

123. The Q2 2026 Earnings Release quoted Defendant Singh as stating, in relevant part:

> As we conclude the second quarter of our fiscal year, we are encouraged by our progress and remain confident in the path ahead. We are on track to report topline data from the randomized portion of our PALISADE3 Phase 3 trial of

> fasedienol for the acute treatment of social anxiety disorder this quarter, followed by the randomized portion of our PALISADE-4 Phase 3 trial in 2026. We have built strong momentum toward the primary goal of our PALISADE program, developing what we hope could be the first FDA-approved acute treatment of social anxiety disorder for the 30 million adults living with this serious and potentially life-threatening condition.

124. Later that day, the Company hosted an earnings call with investors and analysts to discuss the second quarter results (the "Q2 2026 Earnings Call").

125. During the question-and-answer portion of the Q2 2026 Earnings Call, in response to questions regarding why patients may have screen failed the PALISADE-3 Study and FDA filing, Defendants Singh and Prince stated, in relevant part:

> *Andrew Tsai – Jeffries LLC*: And then last question is from what you can tell, what have been the top reasons why patients screen failed in PALISADE-3? And are the top reasons different from what you saw in PALISADE-2?
>
> *Defendant Singh*: So we can unpack that later. But what I can tell you, Andrew, is the reason that we made enhancements to the PALISADE-3 and 4 studies, again, was to make sure that there's very high-quality assessment for subject eligibility. And as a result of that, we had our own teams involved here with our teams for subject eligibility review. We had other enhancements into the execution of the study, of course, throughout the duration of the study.
>
> So I think we've seen generally what we've expected to see and as we've modeled forward for not only screen fail, but also attrition rates throughout the course from enrollment through randomization through the end of the study. So I think we're comfortable with what we've typically seen and maybe more to come on that later. The important piece of the puzzle is -- yes, one more thing is obviously the important piece of the puzzle is that we got to the last patient class visit with the full complement that we had modeled for purposes of the studies. We've noted before, our end target was 236. So last patient class visit reflects our original thought.
>
> *Unknown Analyst*: I guess for us, assuming one of PALISADE-3 or PALISADE-4 works, is there anything else gating registration -- gating filing? Is there anything else that you need to complete before then? How soon can you file?
>
> *Defendant Singh*: So as you know, as we move closer toward completion of

> the Phase III development program, we always plan to interact with the agency. But we've said this before, obviously, it's the pivotal program data, it's a repeat dose study. It's the open-label data from our long-term safety study, a human factor study, the typical preclinical safety-related studies, reprotox and carc, all those are aspects that we expect to have wrapped up upfront, of course, of an NDA package. So -- and we'll, of course, be meeting with the FDA as we get closer to make sure that we're in line with what's necessary regarding a submission package. So we estimate currently, and if everything goes according to plan that we've been executing on, we could see an NDA submission if PALISADE-3 is positive sometime around the middle of '26.
>
> *Myles Robert Minter – William Blair & Co.*: And then second is just, I think in late October, you updated clinicaltrials.gov. You terminated a site in Arkansas and Kansas. I'm just curious whether that was because you've completed enrollment and you didn't need those sites anymore or just because of your site vigilance and you're going to see these sites in person? Was it something performance related that you terminated those sites?
>
> *Defendant Prince*: As we've gone through the course of these studies for both PAL-3, PAL-4, it's a constant evaluation of fit with sites. And so we've had a few sites that, for whatever reason with regard to their ability to enroll the appropriate patients, whether it was their recruitment programs or other reasons, just they were not able to enroll. And so at some point, it makes sense to terminate those sites. There's been 1 or 2 like that.
>
> And then also beyond that, as we -- to your point, as we get towards the end of the study, we definitely take a wind-down approach for a soft landing for the study to make sure it's well controlled. We're controlling variability and then making sure that we will be able to get from that end of study last patient out to top line results efficiently in the time line that Shawn mentioned. So for us, it's kind of course of business as we've gone through the process of the studies.

126. The statements referenced above in ¶¶ 68-69, 76-81, 89-108, and 116-125 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the positive results of the PALISADE-2 study and the enhancements made to the PALISADE-3 Study did not mean that the results of

PALISADE-3 would be positive; (2) there is a risk of heightened placebo responses, site variability, and measurement noise in trials with public-speaking based endpoints, as witnessed from the Company's Phase 2 trials; (3) as a result of the foregoing, the risk of failure in the PALISADE-3 Study was understated; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## THE TRUTH EMERGES

127. The truth emerged December 17, 2025, after the market closed, when the Company issued the PALISADE-3 Results Press Release.

128. The PALISADE-3 Results Press Release revealed that the PALISADE-3 Study failed to demonstrate statistical significance on its primary endpoint of change on the SUDS. The PALISADE-3 Results Press Release stated, in relevant part:

> The trial did not achieve its primary endpoint, as measured by the least squares (LS) mean change from baseline on the Subjective Units of Distress Scale (SUDS) score for fasedienol (13.6 +/-1.54 standard error, SE) compared with placebo (14.0 +/-1.51 SE), a LS mean difference of 0.4 (p = not significant). There was no treatment difference between fasedienol and placebo for the secondary endpoints. The favorable safety data of fasedienol were consistent with previous clinical trials.

129. In addition, the PALISADE-3 Results Press Release quoted Defendant Singh as stating:

> We are disappointed by the unexpected results of this public speaking challenge trial, which are inconsistent with positive outcomes observed in Phase 2 and our PALISADE-2 Phase 3 study. We are thoroughly reviewing the results of the study, evaluating the potential impact of the results on our ongoing studies and plan to seek feedback from the FDA.

130. On this news, the price of the Company's stock fell $3.50 per share, or approximately 80.3%, from a close of $4.36 per share on December 16, 2025, to close at $0.86 per share on December 17, 2025.

## DAMAGES TO VISTAGEN

131. As a direct and proximate result of the Individual Defendants' conduct, Vistagen has lost and will continue to lose and expend many millions of dollars.

132. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

133. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

134. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

135. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

136. As a direct and proximate result of the Individual Defendants' conduct, Vistagen has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

137. Plaintiff brings this action derivatively and for the benefit of Vistagen to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Vistagen, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and

violations of the Exchange Act.

138. Vistagen is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

139. Plaintiff is, and has been at all relevant times, a shareholder of Vistagen. Plaintiff will adequately and fairly represent the interests of Vistagen in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

140. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

141. A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Vistagen's Board consisted of the following five individuals: Defendants Singh, Cunningham, Curley, FitzPatrick, and Saxe (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to three of the five Director-Defendants that were on the Board at the time this action was filed.

142. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

143. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Vistagen to issue materially false and misleading statements. Specifically, the Director-Defendants caused Vistagen to issue false and misleading statements which were intended to make Vistagen appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants

breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

144. In addition, the Director-Defendants caused the April 2024 Proxy Statement to call for a shareholder vote to approve the 2024 Amendment to the 2019 Plan, which increased the amount of shares available under the 2019 Plan by 4 million. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2024 Amendment to the 2019 Plan who would not have approved the 2024 Amendment to the 2019 Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2024 Amendment to the 2019 Plan at the special meeting of stockholders of Vistagen on May 29, 2024, 30,348 shares remained available for future issuance under the 2019 Plan. After the shareholders approved the 2024 Amendment to the 2019 Plan, there were an additional 4 million shares available for issuance under the 2019 Plan. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for from the issuance of the false and misleading April 2024 Proxy Statement and the shareholders approving the 2024 Amendment to the 2019 Plan that increased the number of shares available under the 2019 Plan. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

145. Additional reasons that demand on Defendant Singh is futile follow. Defendant Singh has served as the Company's CEO and as a Company director since August 2009. Defendant Singh has also served as the Company's President since December 2024. The Company provides Defendant Singh with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is not an independent director. As the Company's highest officer, Defendant Singh conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In

addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Furthermore, he solicited the July 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Cunningham, Curley, FitzPatrick, Gin, Rotunno, Saxe, and himself to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Singh solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Cunningham, Curley, FitzPatrick, Rotunno, Saxe, and himself to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Singh is also named as a defendant in the Securities Class Action. Moreover, under the 2024 Amendment to the 2019 Plan, Defendant Singh is eligible to receive stock awards under the 2024 Amendment to the 2019 Plan, thereby materially benefiting from the adoption of the 2024 Amendment to the 2019 Plan. For these reasons, too, Defendant Singh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146. Additional reasons that demand on Defendant Cunningham is futile follow. Defendant Cunningham has served as a Company director since January 2019. Defendant Cunningham also serves as the Chair of the Compensation Committee and the Chair of the Corporate Governance and Nominating Committee, as well as a member of the Audit Committee. Previously, Defendant Cunningham served as the Company's Chief Commercial Officer from May 2021 until November 2022. The Company provides Defendant Cunningham with handsome compensation for her role as a director. As a trusted, long-time director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, she solicited the July 2024

Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Singh, Curley, FitzPatrick, Gin, Rotunno, Saxe, and herself to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Cunningham solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Singh, Curley, FitzPatrick, Rotunno, Saxe, and herself to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. Moreover, under the 2024 Amendment to the 2019 Plan, Defendant Cunningham is eligible to receive stock awards under the 2024 Amendment to the 2019 Plan, thereby materially benefiting from the adoption of the 2024 Amendment to the 2019 Plan. For these reasons, too, Defendant Cunningham breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

147. Additional reasons that demand on Defendant Curley is futile follow. Defendant Curley has served as a Company director since April 2021. She also serves as a member of the Audit Committee and the Corporate Governance and Nominating Committee. The Company provides Defendant Curley with handsome compensation for her role as a director. As a trusted, long-time director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, she solicited the July 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Singh, Cunningham, FitzPatrick, Gin, Rotunno, Saxe, and herself to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Curley solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Singh, Cunningham, FitzPatrick, Rotunno, Saxe, and herself to the Board, thereby allowing them to continue to breach their fiduciary duties to

the Company. Moreover, under the 2024 Amendment to the 2019 Plan, Defendant Curley is eligible to receive stock awards under the 2024 Amendment to the 2019 Plan, thereby materially benefiting from the adoption of the 2024 Amendment to the 2019 Plan. For these reasons, too, Defendant Curley breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

148. Additional reasons that demand on Defendant FitzPatrick is futile follow. Defendant FitzPatrick has served as a Company director since July 2021, and as the Board's Chair since 2023. Defendant FitzPatrick also serves as a member of the Compensation Committee. The Company provides Defendant FitzPatrick with handsome compensation for her role as a director. As a trusted, long-time director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, she solicited the July 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Singh, Cunningham, Curley, Gin, Rotunno, Saxe, and herself to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant FitzPatrick solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Singh, Cunningham, Curley, Rotunno, Saxe, and herself to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. Moreover, under the 2024 Amendment to the 2019 Plan, Defendant FitzPatrick is eligible to receive stock awards under the 2024 Amendment to the 2019 Plan, thereby materially benefiting from the adoption of the 2024 Amendment to the 2019 Plan. For these reasons, too, Defendant FitzPatrick breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

149. Additional reasons that demand on Defendant Saxe is futile follow. Defendant Saxe has served as a Company director since 2000, serving as Chair of the Board until 2023. Defendant Saxe also serves as the Chair of the Audit Committee, and as a member of the Compensation Committee and the Corporate Governance and Nominating Committee. The Company provides Defendant Saxe with handsome compensation for his role as a director. As a trusted, long-time director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, he solicited the July 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Singh, Cunningham, Curley, FitzPatrick Gin, Rotunno, and himself to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Saxe solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Singh, Cunningham, Curley, FitzPatrick, Rotunno, and himself to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. Moreover, under the 2024 Amendment to the 2019 Plan, Defendant Saxe is eligible to receive stock awards under the 2024 Amendment to the 2019 Plan, thereby materially benefiting from the adoption of the 2024 Amendment to the 2019 Plan. For these reasons, too, Defendant Saxe breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150. Additional reasons that demand on the Board is futile follow.

151. Defendants Saxe (as Chair), Cunningham, and Curley served as members of the Audit Committee at all relevant times (collectively, the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the

Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

152. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

153. Vistagen has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Vistagen any part of the damages Vistagen suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

154. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

155. The acts complained of herein constitute violations of fiduciary duties owed by Vistagen's officers and directors, and these acts are incapable of ratification.

156. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Vistagen. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Vistagen, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

157. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Vistagen to sue the Individual Defendants named herein, since,

if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

158. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Defendants Singh, Cunningham, Curley, FitzPatrick, Gin, Rotunno, and Saxe for Violations of Section 14(a) of the Exchange Act**

159. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

160. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

161. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

162. Under the direction and watch of Defendants Singh, Cunningham, Curley, FitzPatrick, Gin, Rotunno, and Saxe, the July 2024 and 2025 Proxy Statements failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers

or without such waivers being disclosed; and (2) contrary to the July 2024 and 2025 Proxy Statements' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

163. The April 2024, July 2024, and 2025 Proxy Statements also failed to disclose that: (1) the positive results of the PALISADE-2 study and the enhancements made to the PALISADE-3 Study did not mean that the results of PALISADE-3 would be positive; (2) there is a risk of heightened placebo responses, site variability, and measurement noise in trials with public-speaking based endpoints, as witnessed from the Company's Phase 2 trials; (3) as a result of the foregoing, the risk of failure in the PALISADE-3 Study was understated; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

164. In exercise of reasonable care, Defendants Singh, Cunningham, Curley, FitzPatrick, Gin, Rotunno, and Saxe should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the April 2024, July 2024, and 2025 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the April 2024, July 2024, and 2025 Proxy Statements, including but not limited to the re-election of directors and the approval of the 2024 Amendment to the 2019 Plan.

165. The false and misleading elements of the April 2024 Proxy Statement led to, among other things, the approval of the 2024 Amendment to the 2019 Plan.

166. The false and misleading elements of the July 2024 Proxy Statement led to, among other things, the re-election of Defendants Singh, Cunningham, Curley, FitzPatrick, Gin, Rotunno, and Saxe, thereby allowing them to continue breaching their fiduciary duties to the Company.

167. The false and misleading elements of the 2025 Proxy Statement led to, among other things, the re-election of Defendants Singh, Cunningham, Curley, FitzPatrick, Rotunno, and Saxe, thereby allowing them to continue breaching their fiduciary duties to the Company.

168. Plaintiff, on behalf of Vistagen, has no adequate remedy at law.

**SECOND CLAIM**

**Against the Individual Defendants for Breach of Fiduciary Duties**

169. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

170. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Vistagen's business and affairs.

171. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

172. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Vistagen.

173. Also in breach of their fiduciary duties owed to Vistagen, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the positive results of the PALISADE-2 study and the enhancements made to the PALISADE-3 Study did not mean that the results of PALISADE-3 would be positive; (2) there is a risk of heightened placebo responses, site variability, and measurement noise in trials with public-speaking based endpoints, as witnessed from the Company's Phase 2 trials; (3) as a result of the foregoing, the risk of failure in the PALISADE-3 Study was understated; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be

materially false and misleading at all relevant times.

174. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

175. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

176. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Vistagen's securities.

177. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Vistagen's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

178. These actions were not a good-faith exercise of prudent business judgment to

protect and promote the Company's corporate interests.

179. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Vistagen has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

180. Plaintiff, on behalf of Vistagen, has no adequate remedy at law.

**<u>THIRD CLAIM</u>**
**Against the Individual Defendants for Unjust Enrichment**

181. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

182. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Vistagen.

183. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Vistagen that was tied to the performance or artificially inflated valuation of Vistagen, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

184. Plaintiff, as a shareholder and a representative of Vistagen, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

185. Plaintiff, on behalf of Vistagen, has no adequate remedy at law.

**<u>FOURTH CLAIM</u>**
**Against the Individual Defendants for Abuse of Control**

186. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

187. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Vistagen, for which they are legally responsible.

188. As a direct and proximate result of the Individual Defendants' abuse of control, Vistagen has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

189. Plaintiff, on behalf of Vistagen, has no adequate remedy at law.

**FIFTH CLAIM**

**Against the Individual Defendants for Gross Mismanagement**

190. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

191. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Vistagen in a manner consistent with the operations of a publicly held corporation.

192. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Vistagen has sustained and will continue to sustain significant damages.

193. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

194. Plaintiff, on behalf of Vistagen, has no adequate remedy at law.

**SIXTH CLAIM**

**Against Individual Defendants for Waste of Corporate Assets**

195. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196. The Individual Defendants caused the Company to pay the Individual

Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

197. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Vistagen to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

198. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

199. Plaintiff, on behalf of Vistagen, has no adequate remedy at law.

**SEVENTH CLAIM**

**Against Defendants Singh and Prince for Contribution Under Sections 10(b) and 21D of the Exchange Act**

200. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201. Vistagen and Defendants Singh and Prince are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Singh's and Defendant Prince's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

202. Defendants Singh and Prince, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

203. Accordingly, Defendants Singh and Prince are liable under 15 U.S.C. § 78j(b),

which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

204. As such, Vistagen is entitled to receive all appropriate contribution or indemnification from Defendants Singh and Prince.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Vistagen, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Vistagen;

(c) Determining and awarding to Vistagen the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Vistagen and the Individual Defendants to take all necessary actions to reform and improve Vistagen's corporate governance and internal procedures to comply with applicable laws and to protect Vistagen and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Vistagen to nominate at least three candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding Vistagen restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: May 13, 2026

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/*Robert C. Moest ___________________

Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Email: rmoest@gmail.com

*Attorneys for Plaintiff*

**VERIFICATION**

I, Richard Strekal, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of May, 2026.

DocuSigned by:
richard strekal
1840E92E40A4452...
Richard Strekal